107 So.2d 509 (1958)
Vera LEJEUNE, Appellee,
v.
STATE FARM MUTUAL AUTOMOBILE INSURANCE CO. et al., Appellant.
No. 4676.
Court of Appeal of Louisiana, First Circuit.
November 21, 1958.
Rehearing Denied January 5, 1959.
Writ of Certiorari Denied February 16, 1959.
*510 McGehee & McKinuis, Baton Rouge, for plaintiff-appellant.
Hynes, Mathews & Lane, Baton Rouge, for defendant-appellant.
John V. Parker, Asst. City-Parish Atty., and Seale, Hayes, Smith & Keogh, Baton Rouge, for defendant-appellee.
ELLIS, Judge.
On October 26, 1956, at about 1:30 A.M. the plaintiff was a guest passenger in an 1947 Chevrolet automobile being driven by John DiBenedetto, and owned by his father, when it was involved in a collision with an automobile owned and being driven by Louis Lobell. Plaintiff suffered serious injuries and filed suit against the insurer of Lobell, which was the State Farm Mutual Automobile Insurance Company, the Allstate Insurance Company as the insurer of John DiBenedetto, owner of the 1947 Chevrolet in which she was a guest passenger, and the Parish of East Baton Rouge. In the trial court judgment was awarded in favor of the plaintiff against the State Farm Mutual Automobile Insurance Company in the amount of $10,000 plus legal interest and costs, which represents the limit of the policy. Recovery was denied against the two remaining defendants. State Farm has appealed suspensively and the plaintiff has devolutively appealed from the judgment insofar as it denies recovery against Allstate Insurance Company and the Parish of East Baton Rouge.
On the early morning of the accident Lobell and his three passengers, Jessie Murphy, Andrew S. Murphy and Otto Murphy, Jr., had completed their day's work at Delta Tank and were returning to their home in French Settlement, Livingston Parish, Louisiana. They were proceeding east on Winbourne Avenue in the *511 City of Baton Rouge and had neared the intersection of Dougherty Drive and Winbourne when the DiBenedetto automobile approached in the opposite lane in a diagonal direction across Winbourne Avenue in front of Lobell's car, resulting in the front of the latter's car striking the Di-Benedetto car in its right side, and as a result of the collision both cars were considered a total wreck. The evidence revealed that young DiBenedetto was in the air force and had returned home on leave and had picked up the plaintiff and had taken her to his home and sometime after eight o'clock had gotten his father's 1947 Chevrolet car and the two of them had gone to the Extension Lounge on Florida Street where they danced and admitted drinking three or four beers, until sometime around one o'clock when they started home. They were traveling west on Winbourne Avenue and when they arrived near a point approximately 12 feet west of the west intersecting line of Blackwell Drive young Di-Benedetto's car left the paved portion of Winbourne Avenue and its right rear wheel slipped into the ditch approximately two feet deep and proceeded down this ditch a distance of 132 feet when the left front wheel came out of the ditch and the car then skidded sideways with its right hind wheel in the ditch 36 feet further, where the right front wheel then came up on the road and the car came out of the ditch and went in a diagonal, direction a distance of 56 feet across Winbourne Avenue and directly in front of the Lobell car where the impact occurred near the south side of the avenue. The evidence further shows that the force of the blow by the DiBenedetto car which crossed into Lobell's lane of travel knocked the latter's car back and to the side six feet and then continued 12 feet more. The total distance travelled by the DiBenedetto car from where it left the Winbourne Avenue to the point of impact was 224 feet. Neither young DiBenedetto, driver of his father's 1947 Chevrolet, nor the plaintiff had any remembrance or recollection of the accident, and, in fact, only remember leaving the Extension Lounge when they told some members of the band and other people whom they knew goodnight.
Lobell and his three passengers all testified that the car they were in was being driven at approximately 25 miles an hour from the time that they left the Delta Plant and just prior to the collision; that Lobell was driving on his right side and first discovered that the DiBenedetto car was out of control when the left front wheel came back toward the highway and the car started skidding sideways, which was a distance of 92 feet from the final point of collision. The actual point of collision was 40 feet east of the intersection of Dougherty Drive with Winbourne Avenue. Lobell immediately applied his brakes when he discovered or saw the DiBenedetto car coming toward his lane of travel at the time it started out of the ditch to its left. The investigating officers found 19 feet of skid marks from one wheel of the Lobell car but stated that evidently had the brakes been on all the wheels it had been obliterated at the time of their investigation.
Therefore, under the undisputed facts in this case, the DiBenedetto car came suddenly across Winbourne Avenue and into the lane of travel of Lobell, and while this did not make applicable the doctrine of res ipsa loquitur (Larkin v. State Farm Mutual Automobile Insurance Company, 233 La. 544, 97 So.2d 389), it does under our well settled jurisprudence raise the presumption that DiBenedetto was negligent in the operation of the 1947 Chevrolet automobile. In Noland v. Liberty Mutual Ins. Co., 232 La. 569, 94 So.2d 671, 673, our Supreme Court stated:
"In view of these provisions, and since the instant collision occurred while the bakery truck was in the wrong traffic lane, the presumption is that Goudeau was negligent in the operation of his vehicle. And it follows that the burden is upon him to show that the accident was not caused by his *512 negligence or that there were justifiable circumstances which would excuse his conduct. See Schick v. Jenevein, 145 La. 333, 82 So. 360 and Miller v. Hayes, La.App., 29 So.2d 396."
Again in the case of Rizley v. Cutrer, 232 La. 655, 95 So.2d 139, 140, our Supreme Court through Justice McCaleb reiterated the rule of law as stated in the Noland case as follows:
"Since the primary cause of the collision was Cutrer's act in driving his car into that part of the road way reserved exclusively for traffic proceeding from the opposite direction, a mere statement of the accident makes out a prima facie case of negligence against Cutrer and, therefore, it was incumbent upon defendants to show by clear and convincing evidence that Cutrer's sudden presence in plaintiff's traffic lane was due to unexpected and unforeseen circumstances over which he had no control and that he did not in any particular contribute to the mishap. See Schick v. Jenevein, 145 La. 333, 82 So. 360; Miller v. Hayes, La.App., 29 So.2d 396 and Noland v. Liberty Mutual Ins. Co., 232 La. 569, 94 So.2d 671."
While the negligence of DiBenedetto as the driver of the 1947 Chevrolet is not imputed to the plaintiff and, in fact, there is no contributory negligence shown on the part of the plaintiff, it does directly affect the liability of Allstate Insurance Company, the insurer of his father, John J. DiBenedetto. In order for the insurer to be relieved of liability it is incumbent upon it to show by clear and convincing evidence that DiBenedetto's sudden presence in defendant's traffic lane was due to unexpected and unforeseen circumstances over which DiBenedetto had no control and that he did not in any particular contribute to the mishap. In order to remove any negligence from young DiBenedetto, the driver of the 1947 Chevrolet, Allstate adroitly argues that counsel for plaintiff has raised the doctrine of res ipsa loquitur as applicable to the facts of the instant case, and he therefore dwells at length in his brief on the holding in Larkin v. State Farm Mutual Automobile Insurance Company, supra, and the case of Mershon v. Cutrer, La.App., 85 So.2d 639, which was decided by this court but reversed by the Supreme Court for the reasons given in the case of Rizley v. Cutrer, supra. We agree that the doctrine is not applicable in this case as will be revealed by a reading of the Larkin case. Counsel for Allstate does not mention the Noland nor Rizley cases, supra. Secondly, in an attempt to relieve DiBenedetto of any negligence, counsel for Allstate joins with plaintiff in charging the Parish of East Baton Rouge with negligence for faulty construction of Winbourne Avenue and the defective condition at or near the point where the Di-Benedetto car left the paved portion of Winbourne Avenue.
Counsel representing all parties made the following stipulation:
"Mr. Parker: It is stipulated by and between all parties that that portion of Winbourne Avenue running east of Blackwell Drive was constructed in 1951 under a contract let by the Parish of East Baton Rouge to Barber Brothers Contractors, and that the construction of the street was accepted by the Parish of East Baton Rouge, that is the contract was accepted, the work performed under the contract.
"We can add to that stipulation that that portion of Winbourne Avenue east of Blackwell Drive was tied in near Blackwell Drive at that intersection with existing pavement which ended at Blackwell Drive.
"It is further stipulated that the new portion of the road bed was of a greater width than the old road bed, resulting in a set off, we will call it for want of a better term, a set off at that point.
"The Court: Do you want to stipulate how much wider?

*513 "Mr. Parker: We can stipulate to this, that the new road bed was constructed to a width of twenty-two feet, three inches that is, the pavement and the old road bed has a width of twenty feet.
"Mr. McGehee: It is further stipulated by all parties that the photographs marked P-D-1 through 35 are jointly offered and admitted in evidence."
From the above and foregoing stipulation it is clearly shown that the Parish of East Baton Rouge in 1951 reconstructed Winbourne Avenue east of Blackwell Drive and in doing so widened it to 22 feet, 3 inches, so that if it had ordinarily joined the old portion of Winbourne Avenue there would have been a 2 foot 3 inch offset as the old portion of Winbourne Avenue to the west of the intersection of Blackwell Drive with Winbourne Avenue was 20 feet in width. In order to prevent a sharp offset the engineers recommended and used what is known as a "taper". In other words, they gradually tapered the new part of Winbourne Avenue into the old. The photographs introduced by plaintiff and defendants vividly show the construction and the taper at the point where the new and old Winbourne Avenue are joined. It is clearly demonstrated by an officer in one of the pictures as to exactly where DiBenedetto ran off the paved portion of Winbourne Avenue. The tracks or marks left by the right front and rear tires are shown in the rather high grass growing on the slope going into the ditch. This was not an abrupt two foot ditch but its sides sloped for 18 inches to a depth of 2 feet. The exact point shown in the picture as to where DiBenedetto ran off of the avenue is 12 feet west of the extension of the west line of Blackwell Drive at its intersection with Winbourne Avenue. The photographs and the tire marks show that DiBenedetto went off practically at the end of the taper. It would appear that if he had been anywhere from six inches to ten inches to the south he would have unsuccessfully stayed on the paved portion of Winbourne Avenue. It is argued, of course, that this taper was of poor construction and constituted a hazard, a trap and was such a defect as to require warning signs of some kind by the Parish of East Baton Rouge.
We do not believe that under the facts as revealed by the testimony or the photographs introduced that DiBenedetto can be excused for his gross negligence in running off of the paved portion of Winbourne Avenue. We have a photograph in evidence of this portion of Winbourne Avenue taken at night at approximately the same time as the occurrence of the accident. There is a bright street light located in the southeast corner of the intersection of Blackwell Drive and Winbourne Avenue. The photograph shows such lights down Winbourne Avenue in a westerly direction. The light at the intersection of Blackwell and Winbourne Avenue brightly illuminates all of Winbourne Avenue to the east of the intersection of Blackwell Drive and to the end of "the taper". In addition the testimony shows that the lights on the DiBenedetto car were in good condition. We fail to see any excuse for DiBenedetto's failure to keep his car under proper control and on the paved portion of Winbourne Avenue. In Rizley v. Cutrer, supra, the facts were much more favorable to the defendant than in the case at bar. In the case at bar the night was clear and the road only possibly wet or damp from dew, while in the Rizley case it was a rainy, misty night and the road was wet and the shoulder adjacent was slippery and muddy. There were no street lights as in the case at bar. The Supreme Court in its opinion described the nature and construction of the highway at the point of the accident as follows [232 La. 655, 95 So.2d 141]:
"Highway 190 at and near the point of the accident is a straight two-lane thoroughfare running east and west. The paved portion of the highway is 18 feet in width and is bordered by earthen shoulders of six to eight feet, ample to accommodate parked cars. *514 Running east from the town of Elton, the paved portion of the highway has been supplemented by concrete strips which, as heretofore stated, are two feet wide for 250 feet and then taper down to a width of one foot for another 250 feet, where they abruptly end. However, at the terminal of the strip, there is no appreciable drop onto the earthen shoulder but there exists a depression which has been caused by the repeated contact of motor traffic with the shoulder of the road.
"It was dark on the morning of the accident and all vehicles were using their lights. It was raining or drizzling intermittently causing the shoulders of the highway to be muddy and insecure. In his explanation of the accident Cutrer testified that, soon after driving through the town of Kinder, or about 10 miles west of Elton, he began to encounter heavy trucks approaching from the opposite direction; that it was still dark, a drizzling rain was falling and the headlights from the oncoming trucks interfered to some extent with his visibility; that, during the 10 miles to Elton, he glanced once at his speedometer which showed that he was traveling between 45 and 50 miles per hour; that, since the passing trucks were being driven close to the center line, he felt `rather crowded' and that, upon reaching Elton, he noticed the strip bordering his lane, which gave him a little more room, so he moved over and drove with his right wheels on the strip. However, Cutrer relates that, when his car approached the terminal point of the strip, he did not see it because he believes that he may have been partially and temporarily blinded by headlights of an oncoming truck and he indicates that he expected that there would be a posted sign notifying motorists of the end of the strip. He stated `When the pavement stopped at a square end, well I ran off the square end of the pavement.' Although he was not sure whether his front wheels `fell off' the road and onto the shoulder, Cutrer says that he felt the back wheels go off the strip, at which time his car went out of control and swerved and skidded over into plaintiff's oncoming car.
* * * * * *
"Here, the situation is different because Cutrer, having caused the accident by leaving his own traffic lane, is presumed guilty of negligence and the onus rested on him to demonstrate that the accident resulted from such a state of unforeseeable circumstances beyond his control (and to which he did not contribute), that he could not extricate himself, despite the efficient use of all protective measures at his command. In other words, it was his burden to show that he was not guilty of any dereliction, however slight, which may have had causal connection with the accident. We say this because it seems only reasonable to resolve that a motorist owes to the travelling public the duty of remaining in his own lane of traffic and, when he undertakes to enter the lane devoted to approaching traffic, he must be held strictly accountable for all damages resulting therefrom unless he clearly exhibits that his conduct in no wise contributed to the accident. By this, of course, we do not mean that such a motorist is the insurer of the safety of those injured in an accident such as the one in the instant case but only that, in order to be exonerated, he must establish his freedom from all fault by convincing proof.
"In the case at bar, we think that the evidence submitted by defendants falls far short of that mark as a careful scrutiny of Cutrer's testimony makes it evident that he did not have his car under such control, prior to the accident, as was required by the circumstances of the occasion. Faced with unseemly weather conditions and *515 oncoming trucks from the opposite direction, whose lights admittedly interfered with his vision, while travelling on a road which he found to be too narrow to comfortably accommodate the heavy trucks and his car, it was imprudent for Cutrer to continue to drive at an admitted speed of 45 to 50 miles per hour. We believe that a reasonably prudent man would have also anticipated and expected that the concrete strip, which began at the town of Elton and on which he was travelling, would not long continue and that it would come to an end soon after he passed the town.
"It is doubtful that, if Cutrer had had his car under proper control, it would have slid across the roadway onto the opposite lane upon encountering the earthen shoulder of the highway at the point where the concrete strip terminated. Except for his assertion that the shoulder was muddy, Cutrer makes no attempt to explain why he lost control or what measures were taken by him to keep the car from running into the other lane. Such a statement is wholly insufficient to exonerate him from fault (see Noland v. Liberty Mutual Ins. Co., supra) and it is just as reasonable to conclude that he lost control by a hazardous attempt to regain the paved portion of the road as it is to say that the car slid over from its own momentum despite the efforts of the driver to prevent it from doing so."
In the case at bar there was no reason for DiBenedetto to have to "anticipate" that the concrete or hard surface would come to "an end soon", for the road was straight, the night was clear, street lights lit up the taper, he had good lights on his automobile, and if he had been driving within the speed limit there is no reason for him to have lost control of his car at all or for him to have run off of the paved portion of the highway. He was not keeping a proper lookout and he was driving at an excessive rate of speed. The taper in the road under the facts and circumstances as revealed by all the evidence in this case did not constitute a hazard or a trap to any motorist driving in a careful and reasonable manner and keeping a proper lookout. We thought different in the case of Mershon v. Cutrer, and our finding of fact was different from that of the Supreme Court. We believe that the excessive speed of DiBenedetto is shown by the fact that after the wreck the speedometer was stopped between 55 and 60 miles per hour evidently due to the fact that at the moment of collision the glass on the speedometer broke, and, as described by one witness, a sliver of glass fell against the speedometer and held it in a position between 55 and 60 miles. The witness later took the stand and attempted to say that the car could not have been going that fast as it would have turned over traveling sideways as the physical evidence showed that it did for a distance of some 92 feet prior to the actual impact. We are of the opinion that he was going that fast or faster prior to the actual running in the ditch, for the DiBenedetto car did practically all of the damage by the force of its speed when it struck the front of Lobell's car and the testimony as well as the pictures show a total loss on both cars. In contrast to the speed of the DiBenedetto car the Lobell car was traveling 25 miles an hour and had put on its brakes and skidded its wheels for at least a distance of 19 feet and was therefore close to a stopping point at the time of the actual impact. A detailed description of the apparent demolishment of both cars as shown by the photographs is unnecessary. However, it is certain that the damage to both cars was caused in the main by the speed of the DiBenedetto car and its resulting force at the moment of the impact. Regardless of the testimony of the witness who stated that the car could not have been going that fast or it would have turned over, we are firmly of the opinion that it did go that fast and faster prior to the accident. There is one explanation *516 that would appear reasonable, if it happened, as to why the speedometer would be between 55 and 60, namely, that when the car actually made contact with the Lobell car the speedometer jumped from the impact. It is not shown that it did this and the physical evidence is so overwhelming that reason and logic lead us to the definite conclusion that the DiBenedetto car was traveling at an excessive rate of speed prior to and at the moment of impact.
The defendant Lobell was found to be negligent by virtue of the application of the doctrine of last clear chance or discovered peril enunciated in Jackson v. Cook, 189 La. 860, 181 So. 195 and Rottman v. Beverly, 183 La. 947, 165 So. 153. Briefly the lower court held that Lobell saw or should have seen the DiBenedetto car at the moment it left the paved portion of the highway and at that time should have applied his brakes and stopped, which, of course, would have avoided the accident, probably, but not definitely, according to the testimony. It is definitely established by the testimony that Lobell was on his own side of the road traveling at a safe speed of 25 miles per hour and that he did not notice or observe the DiBenedetto car in any perilous situation or threatening his lane of travel until the DiBenedetto car began its semi-sidewise forward motion at a distance of 92 feet from the point of collision. He testified and the occupants of his car corroborated him, that he immediately applied his brakes, and using the reaction time and the 36 feet the car would have traveled at 25 miles per hour plus the 19 feet it actually is known to have skidded before the impact, and it could have been farther, as the witness testified he only noticed the skid marks on one wheel and the others were possibly obliterated before examination, we can roughly estimate the distance and time Lobell had to avoid the collision. Roughly speaking he was approximately 55 feet from the point of the actual collision which would have placed him 15 feet west of the intersection of Dougherty Drive with Winbourne Avenue and also west of the intersection of the Howell Park road with Winbourne Avenue, which is almost directly across from Dougherty Drive. In other words, while he was traveling 36 feet at 25 miles an hour or one second, and 19 feet with his brakes on the Di-Benedetto car traveled 92 feet sideways, which would be approximately twice the distance and twice the speed or some 50 or better miles per hour. This is corroborated by the reading on the speedometer after the accident. This testimony also would corroborate Lobell in his statement that he at first thought that DiBenedetto came out of Howell Park to his left and it was after the accident that he learned that he came out of the ditch to the east of Howell Park intersection. But the physical fact which made Lobell think it came out of Howell Park was that when the DiBenedetto car came out of the ditch its lights naturally shown diagonally across the road in front of him. This testimony could also place him to the north of the intersection of Dougherty Drive which was 40 feet west of the point of actual impact between the two cars. It goes without argument that unless Lobell would have seen the DiBenedetto car when it first went off of the paved portion of Winbourne Avenue that he had no chance to avoid this accident, and the doctrine of last clear chance or discovered peril would not be applicable. We find no reason based upon the evidence as to why Lobell should have seen the DiBenedetto car when it left the paved portion of Winbourne Avenue for at that time it was traveling in a straight line with the left part of the car still on Winbourne Avenue. As a matter of fact the left wheels of the Di-Benedetto car were at all times up to the point that it began to go sideways, which was 92 feet from the point of impact, close to the paved portion of Winbourne Avenue. It came straight to within 92 feet of the point of impact when it suddenly turned sideways and came out of the ditch and across the road a distance of some 56 feet to the point of impact. The DiBenedetto car did nothing until it reached a point 92 *517 feet from the point of impact that would have led Lobell to believe that it was in distress or trouble or that it was even off of the paved portion of Winbourne Avenue. Lobell was under a duty primarily to observe the 30 mile speed limit on Winbourne Avenue, to remain on his side of the street and to watch for obstacles or vehicles on his side of the street. He was not under that same duty to minutely watch approaching motor vehicles so long as they apparently were traveling on their side of the highway and in a proper manner. We reiterate that had DiBenedetto been traveling within the speed limit and keeping a proper lookout he would not have left the paved portion of Winbourne Avenue, and even if he did at 30 miles per hour, there would have been no collision. An expert for plaintiff testified that had DiBenedetto's car been traveling 30 miles per hour and he had taken his foot off the accelerator it would have coasted to a stop within 224 feet.
We are therefore of the opinion that Lobell was guilty of no negligence whatsoever. We are further of the opinion that DiBenedetto created an emergency and that Lobell was guilty of no negligent act which caused or contributed to the resulting collision between the two cars.
The Parish of East Baton Rouge filed an exception of no cause of action and, with reservation of its rights under the exception, an answer. The exception was referred to the merits by the trial judge and was not specifically passed upon as judgment was rendered upon the merits in favor of the parish. The parish is now vigorously reurging its exception, however, we believe the matter can be disposed of upon the merits.
The allegations of plaintiff's petition upon which she hopes to recover against the Parish of East Baton Rouge are as follows:
"6. At or near the intersection of Winbourne Street and Blackwell Drive, there is an abrupt offset which cuts approximately eight feet into Winbourne Street. A ditch follows along the northern side of Winbourne Street at this point, and where the offset dips into the path of the street the ditch also dips into the path of the street, so the situation exists that upon traveling westerly at this point the ditch is in the direct path of cars upon the pavement, and there is no warning of any kind for the protection of motorists.
"7. The construction and design of the street at the point described above is patently unsound. In effect, the street runs abruptly into a ditch without any warning of any kind whatsoever.
"8. The City of Baton Rouge had ample notice, both actual and constructive of the existence of the defect described in the two paragraphs above, and it failed within a reasonable time either to correct same or to erect signs or warnings for the protection of motorists.
* * * * * *
"15. The negligence of the City of Baton Rouge was also one of the proximate causes of this accident for the reasons enumerated above, and because the accident would never have occurred had it not been for the obviously dangerous condition of the street at the point in question. This condition was a public nuisance."
As to the charge that the construction and design of the street at the point where it tapers in to old Winbourne Avenue is patently unsound we feel that this is disposed of by the testimony of plaintiff's expert, Mr. George Ferguson. This witness testified under direct examination as follows:
"Q. How far is that taper? In other words, at the point of that offset, just how far along a vertical line does it offset at that point? A. Well, if you extend a straight line from the *518 roadway going west, the roadway then tapers to the left a distance of eleven and a half feet over the straight line distance of 120 feet. In other words, it moves over one lane west in 120 feet.
"Q. Now, have you studied, have you checked in any authoritative books to determine whether that is either an adequate taper or too much taper along a straight line? A. Yes, I have.
"Q. And what are the results of your findings on that point? A. The test that I am reading from is `A Policy on Geometric Design of Rural Highways' by the American Association of Highway Officials.
"Mr. Parker: Would you repeat that title please, sir?
"A. `A Policy on Geometric Design of Rural Highways' by the American Association of Highway Officials, and for the conditions of this roadway, the minimum length along the alignment that we are talking about would be 150 feet.
"Q. That's under any circumstances? A. That would be under any circumstances, taking in all conditions.
* * * * * *
"Q. Mr. Ferguson, I am not sure, I'm not too familiar with traffic engineering, but did I understand that you testified that at the point of this taper that that road is badly designed and it should not have been done in that manner? A. Yes, sir. My opinion is that the taper should have been extended so that the movement of one lane width would have been extended over a longer straight line than was done on the roadway. If not, even with that, there are other designs. Curves would be a better method of designing, but a taper was used, then a longer length should have been used for this lateral movement of one lane width.
"Q. And that is based on recommended length for such a taper from the work that you mentioned, the "Policy on Geometric Design for Rural Highways', which recommended a length of a taper of 150 feet? A. Yes, sir.
"Q. Now, that particular work, for that length of taper, actually recommends such a length for a speed of forty miles an hour, does it not? A. For a designed speed of forty miles an hour.
"Q. Then when you testified on direct examination that that was under any circumstances 150 feet, that was not correct, was it? A. Maybe you misunderstood me in regard to the circumstances. By circumstances I meant as to whether the road was wet, whether it was day or night, and so forth. They take the worst conditions and then use that as a design.
* * * * * *
"Q. Do you know what the designed speed of Winbourne Avenue is? A. No, I do not know what the designed speed is.
"Q. If the designed speed was forty miles per hour, then this taper should have taken a length of one hundred fifty feet. It actually takes a length of one hundred twenty feet. A. That's right.
"Q. So that if the designed speed of this street were thirty miles per hour this taper according to that ratio should take about a hundred and twelve and a half feet, should it not? A. This ratio is not a strict ratio for a thirty mile per hour design, according to the text. The distance would be a minimum of one hundred twenty feet.
"Q. This road would qualify at that point on thirty mile an hour speed, would it not? A. The point is, if the roadway was designed for *519 thirty miles per hour, it would be one hundred and twenty feet, but the roadway with that condition, with the conditions present, should be designed at forty miles per hour.
"Q. I think you have already testified that you didn't know what the designed speed on Winbourne Avenue was? A. No, sir, I don't but taking the conditions that are present, then, if it is a hundred and twenty feet long, it is not designed for forty miles an hour.
"Q. So that it would be more properly designed for thirty miles per hour? A. Well, at that particular point, yes."
According to the above testimony the construction and design was correct for a 30 mile an hour speed.
The chief engineer of the City Parish Department of Public Works, City Parish Government, Mr. Leo J. Muse, testified on behalf of the parish as to the construction at issue as follows:
"Q. Are you familiar with the situation which exists near the intersection of Blackwell Drive where the taper exists? A. Yes.
"Q. Why was that constructed, Mr. Muse? A. We procured the right of way for the extension of Winbourne Avenue from the existing section to the Airline Highway. We had some difficulty with the procurement of the right of way on the west end and could not get the right of way to be an exact extension of the center line of the existing road. For that reason it was necessary to make a slight offset in the center line of the new portion with respect to the center line of the existing Winbourne Street. If the right of way was available to us in the location we actually used, it would have taken an expropriation suit and we possibly would not have won it, and the difference was so minor that we didn't feel that it was justified in attempting to get a perfectly straight alignment.
"Q. So for that reason an offset was necessary? A. That's right.
"Q. And it was decided to use a taper for that purpose? A. Correct.
* * * * * *
"Q. Mr. Muse, I have marked three photostat pages which have been clipped together as Parish-2. Are these the photostats which you have mentioned? A. These are photostats from the Manual of Geometric Design from the American Association of State Highway Officials, which is, so far as I know, the recognized set of standards governing highway construction.
"Q. What are the tables shown here? A. The first one here, the figure of VII-13, is labeled Acceleration Lanes and Deceleration Lanes, defined as forms of speed change lanes-diagramatic. It shows the types which are customarily used, three types for deceleration, two for acceleration. In all cases they consist of straight lines. The second one, which is the figure VII-15, gives in more detail actual numerical lengths for the various speeds that you might use. And it gives three different standards which are considered acceptable. The first one is the straight taper throughout the entire length of the offset. The second is a continuous reverse curve. The third one is the combination of a curve on each end and a straight center section. Any of the three is regarded as acceptable and they have tables for the overall lengths * * *.
* * * * * *
"Q. Mr. Muse, you have testified that you are quite familiar with that offset at that point on Winbourne *520 Avenue. In your opinion is that area of Winbourne Avenue safe for a reasonably careful driver? A. In my opinion it is safe; we regarded it as safe at the time we constructed it; it has been in use now for a period of five years; it has an average daily traffic count somewhat in excess of two thousand vehicles per day, which means that in the last five years we have had between two and three million vehicles to have driven this route. So far as I have been able to find out this is the only accident which has been caused at this point. So, I think, if you can drive that many cars over the intersection that you consider that any reasonable prudent driver can negotiate it with ease.
"Q. In your opinion, Mr. Muse, is there any necessity for a warning sign of any type at that point? A. No, I don't think there's any necessity. You have a very small angular change to make. I think its very obvious either at day or at night. At night you do have a street light almost exactly at this point which illuminates it."
Of course, Mr. Ferguson testified that in his opinion the taper offset was hazardous and dangerous, whereas Mr. Muse testified that in his opinion it was positively not either. Ferguson thought the parish should have placed a warning or signal device, while Muse thought that the street was perfectly safe for a motorist using ordinarily reasonable care and driving within the speed limit.
Counsel for plaintiff argues that the evidence reveals that there were numerous other accidents at this point caused by the taper or offset in Winbourne Avenue. The police records were produced as well as a witness and there were approximately four accidents but not by virtue of automobiles having run off of Winbourne Avenue at the taper. They were within four or five blocks one way or another of this point. The only definite accident which was approximately a block west of the so-called taper was not due to any defect in Winbourne Avenue. Plaintiff has failed to prove that there were numerous accidents as the result of the tapering between the new and old Winbourne Avenue. Counsel for plaintiff also relies greatly upon the case of Clinton v. City of West Monroe, La.App., 187 So. 561, 566, which we believe is easily distinguished from the case at bar. In the Clinton case there was a deep ditch between 20 and 25 feet wide at the top and 7 feet deep at its center with the banks nearly perpendicular, 140 feet past the intersection of North Fourth Street and Crosley in the city of West Monroe. In other words, this deep ditch was at the end of the street. Due to the excessive speed and drunken condition of the operator of the motor vehicle involved in the accident, a guest passenger was killed along with others in the vehicle, and it was held that such a deep ditch without any barricade or warning constituted negligence on the part of the city. In that case the court said:
"In the exercise of these powers the correlative obligation rests upon the City to employ the utmost care to protect all persons lawfully using its streets, sidewalks and roads, and who exercise ordinary care in doing so, from injury. Persons lawfully using such property of the municipality have a right to assume that they are in a safe condition to travel upon. McCormack v. Robin, 126 La. 594, 52 So. 779, 139 Am.St.Rep. 549, and the many cases therein cited; City of New Orleans v. Le Blanc, 139 La. 113, 71 So. 248; General Securities Company v. City of Hammond, 11 La. App. 306, 123 So. 399."
Counsel attempts to compare the ditch in the present case with that in the Clinton case by stating that "In the instant case, of course, the ditch did not run perpendicular to the street and at the end of *521 same, but, on the other hand it ran parallel to and directly in front of the east bound traffic lane. By turning at a tapered, sharp offset (not a curve) the driver could avoid the ditch straight ahead of his line of travel, but by continuing as one would ordinarily think reasonable, he would be in the ditch with his car out of control." In the present case we believe the street was in a safe condition for anyone to travel upon and there was no reason for any motorist to run into the shallow ditch which ran parallel to Winbourne Avenue and that due to the sloping 18 inch side of this shallow ditch one traveling within the speed limits would probably not lose control of his car.
Counsel for the Parish of East Baton Rouge have fully stated the law as to the duties imposed upon the parish in connection with the allegations that it was negligent in failing to erect and maintain adequate warning signals and devices in connection with the "jog" or "offset" on Winbourne Avenue. We take the liberty of quoting from their brief as follows:
"The liability of the Parish of East Baton Rouge is predicated upon the allegation that it was negligent in failing to erect and maintain adequate warning signals and devices in connection with the `jog' or `offset' on Winbourne Avenue. The first inquiry, therefore, must be into the extent of the duty imposed upon the Parish in this regard.
"American jurisprudence sets forth the degree of care required of authorities responsible for the maintenance of streets and highways as follows:
"`A municipal or quasi municipal corporation is not responsible for every accident that may occur on its streets or highways, nor is it a guarantor of the safety of travelers thereon, or an insurer against all injury which may result from obstructions or defects therein, unless made so by statute. Nor does it warrant that its streets shall be free from obstructions or defects, or that they will be absolutely perfect and safe at all times. So far as concerns liability for injuries caused by obstructions and defects in its public ways, not due to its own wrongful act, its duty and sole duty, in the absence of any statutory provision imposing a higher duty, is to exercise reasonable diligence to put and keep them in a reasonably safe condition for the uses for which they were established, and to which they are properly subject.' 25 Am.Jur., Sec. 373, p. 669.
"As stated by Mr. McQuillin, in his work on Municipal Corporations,
"`The duty to exercise ordinary care to keep streets in a reasonably safe condition of repair does not extend to keeping the highway in such condition that the blind, the infirm and intoxicated persons can use it with safety, provided reasonable diligence has been exercised to make the highway safe for persons in normal condition * * *.' McQuillin, Municipal Corporations, Vol. 19, Sec. 54.11, p. 53.
"`Late decisions, without dissent, follow the well-settled rule (often expressed in a variety of forms) that the municipality is in no event an insurer against accidents to travelers using its public ways, nor a guarantor of their safety in the use thereof, nor is a municipality a warrantor that its sidewalks are safe; it is not every defect in a street or sidewalk, though it may cause injury, which may be attributed to municipal carelessness. * * * Injury due to a defective street to be actionable, therefore, must have been a direct result of the neglect, carelessness, or failure of the municipality in creating or permitting such defect, or its negligent failure after notice, where notice is necessary to remedy the same prior to the happening of the injury. * * *' McQuillin, Municipal Corporations, Vol. 19, Section 54.12, p. 55 et seq.
"In discussing the municipality's duty to guard and warn against danger, Mr. McQuillin states:
*522 "`If the dangerous place is outside the limits of the street, the true test as to the necessity of a barrier is not the distance from the street to the dangerous object or place, but whether a traveler, in passing along the street and exercising ordinary care, would be subjected to such eminent danger that it would require a barrier to make the street safe. In this class of cases the theory generally is that the obstruction, embankment, excavation, or the like is lawful, and that there is no negligence on the part of the municipality merely because of the existence thereof, but that the negligence consists wholly in the failure to protect or warn travelers of the danger resulting therefrom.
"`Unless the place is dangerous, as mentioned, the erection of barriers to guard a street or sidewalk is not required. The duty to place barriers on a street, although travel thereon be in a degree unsafe or even dangerous, it has been said, is not absolute. The law does not require it unless the danger complained of is unusual. That is, ordinarily the danger must be of an unusual character to require a guard rail, but whether such a condition exists in a particular case is generally one of fact and is seldom determinable as a matter of law, for example, where an elevated sidewalk is constructed along an embankment. The question whether it is so dangerous as to require a guard rail may or may not be a question of fact. Accordingly, the well-settled general rule is that a municipality is required to erect and maintain suitable barriers where they are dangerous places along streets, which, without such protection, will render the streets unsafe to travelers in the usual modes by night or day, e. g., where a street abruptly ends at the edge of a precipice.
"`Failure to erect a barrier, which would not have prevented a particular injury had the injured not been negligent, is of no consequence. In other words, the failure to guard and warn must be the proximate cause of the injury.
"`Barriers are not necessary to make or define the limits of a street, although they may be necessary where a street is maintained on two levels, divided by an abrupt declivity. `The city is not, as a rule, bound to make safe for travel the area outside of a public street, nor to fence or erect barriers to prevent travelers from straying off the street to adjoining land, upon which there may be dangerous places; But it is bound to provide such guards where the street itself is unsafe for travel by reason of the close proximity of excavation, embankments, deep water, or other pitfalls or dangers. * * * This is necessary in order to protect persons passing upon the street. * * * And it is merely a matter of keeping the street safe. It is not negligence for a city to construct and maintain a street or roadway along the top of a bluff. Where the road is narrow, and the declivity so near that it may reasonably be anticipated that the passing of vehicles, the shying of horses, or some other incidents of traffic may cause some traveler to deviate from the traveled way, and to go over the edge, the city may well be required to guard such a pitfall along the roadside. The duty required of a city is that of ordinary care.' Likewise, since the object of a barrier is to give warning of a danger in using the street, it is not necessary where the condition of the street itself is a danger signal; and if an excavation in a street is plainly visible, guards are not necessary in the daytime. * * * `McQuillin, Municipal Corporations, Vol. 19, Sec. 54.90, p. 338 et seq.
"Davis v. Department of Highways (La. App.2nd Cir.) 1953, 68 So.2d 263, discusses the standard of care of street and highway authorities as follows:
"`The highway authorities in the exercise of reasonable care toward motorists are required to post notices and signs warning them of dangerous conditions. The rule is so stated in Corpus Juris Secundum:
*523 "`"While the exercise of reasonable care by highway authorities toward motorists may require a placing of signs warning of dangerous conditions, as where there are obstructions or excavations in the way, or the highway terminates abruptly, or a bridge has been destroyed, warning signs need not be maintained at places which do not present an extraordinary condition or unusual hazard, as, for example, at curves of an ordinary character in the highway. Warnings or notices need not be given where the physical facts give sufficient warning of the danger. Where a barrier gives ample and timely warning of the dangerous condition of the road, there is no duty devolving on those in charge of the highway to post notices of the condition of the road some distance therefrom. In determining what is reasonable warning, the place at which the danger exists, the nature of the road, and the general situation and circumstances surrounding it are to be taken into consideration, as are also the kind of travel and the speed at which vehicles will probably travel on the road." 60 C.J.S. Motor Vehicles, § 192, pp. 530, 531.
"`To the same effect see Rosier v. State, La.App.1951, 50 So.2d 31.' 68 So. 2d 263, 265.
"The above authorities clearly show that there is no absolute liability upon municipalities for injuries occurring on its streets. The municipality is not an insurer. In order for any duty to post warning signs or barriers to exist, there must be an unusual and inherently dangerous situation in such proximity to the highway as to make travel upon it unsafe for travelers using the streets for the purpose for which they were constructed and exercising due regard for their own safety."
We have previously discussed the testimony as to the "offset" or "jog" on Winbourne Avenue and from an examination of all the evidence and the excellent pictures filed, we do not find that the "jog" or "offset", which had been greatly minimized by use of the "taper" method, between the new and old construction, constituted any hazard which required the erection and maintenance of warning signals and devices. The slight but gradual offset was safe for any motorist using the highway day or night who kept the proper lookout and was proceeding within the speed limit of 30 miles an hour for which it is admitted the construction was adequate. We therefore find no negligence on the part of the Parish of East Baton Rouge.
We now come to the question of whether the 1947 Chevrolet automobile belonging to Peter DiBenedetto, father of John J. Di-Benedetto, the driver of the automobile at the time of the collision, was covered by the liability policy which Allstate Insurance Company issued to Peter DiBenedetto on April 17, 1956. At the time of the issuance of the policy DiBenedetto owned the car involved in the collision and also a 1954 Chevrolet. The 1947 Chevrolet at the time of the issuance of the policy was not covered nor insured and DiBenedetto testified that he had not intended at that time to obtain coverage on the 1947 Chevrolet automobile, nor had he paid for such coverage. The policy which was issued to DiBenedetto was known as a Standard Form Policy, and if that was all that we had in this case the answer would be very easy for the car would not be covered. However, on August 27, 1956, the Casualty and Surety Division of the Louisiana Insurance Rating Commission issued a bulletin, No. 195, to all companies instructing them that the new family policy was to become effective on October 1, 1956. It is shown in the record that the insurance companies, acting through their national associations, were working on a new form of policy called the "family policy" which was to go into effect throughout the country on September 1, 1956. Actually the "family policy" was placed in effect in Louisiana on October 1, 1956, a month *524 later than its effective date elsewhere. Contained in Bulletin 195 issued by the Casualty and Surety Division of the Louisiana Insurance Rating Commission on August 27, 1956, is the following provision, which is referred to as a directive by Mr. Walker of that Division and we quote:
"Policies written on the Basic Automobile Physical Damage Form or the Basic Combination Automobile Form prior to October 1, 1956 and outstanding as of that date shall be interpreted with respect to losses occurring on and after October 1, 1956 as affording any broader coverage granted by the new Family Automobile Policy Form as to the same coverages."
The broader coverage referred to in the above quoted directive from Bulletin 195 pertinent to the case under consideration are that, first, relatives who are members of the insured household are granted insurance protection under the Family Policy, whereas they had no protection under the old form, and, secondly, the Family Policy covered all of the insured's automobiles unless the specific endorsement is added excluding a named automobile.
In compliance with the directive contained in the bulletin it is shown that all insurance companies, including Allstate, agreed to extend to all their insured the broader benefits of the Family Policy, as of October 1, 1956, even though these benefits were not and could not be spelled out on the forms in existence at that time. This is borne out by the stipulation of counsel for Allstate "That at the time of this accident Allstate Insurance Company had extended to Peter J. DiBenedetto the benefits of a Family Automobile Policy on the existing standard form policy which was in full force and effect on Mr. Di-Benedetto at that time," but counsel also stated later that by such a stipulation he did not mean that he was admitting that there was actually coverage on a 1947 Chevrolet automobile because such benefits as contained in the Family Policy were extended by Allstate "pursuant to instructions from the Casualty and Surety Division of the Louisiana Insurance Commission. We also have in the record the testimony of Mr. John F. Tyler, under cross examination, who was the assistant underwriting manager of the Jackson Regional Office in Jackson, Miss., for the Allstate Insurance Company, and who stated that he was familiar with the circumstances wherein the Family Policy came into existence in Louisiana. This witness was asked:
"Q. Did your company agree by formal letter to the Insurance Department of the State of Louisiana to interpret all of their policies in accordance with the new Family Policy after October 1, 1956? A. It was agreed between our company and the State of Louisiana to interpret the policy as such."
Mr. James H. Bailey, Jr., was called as a witness on behalf of the plaintiff, and stated that he was in the general insurance business and handled policies covering liability of automobiles. He also testified specifically as follows:
"Q. Now, on the date that the new policy went into effect, was a family type policy substituted for every outstanding form policy on your books? A. They were substituted by letter of interpretation filed with the Casualty Commission.
"Q. Filed with the casualty Commission. A. Every automobile that was eligible for the family automobile coverage would be interpreted to have the family automobile coverage in every way that the coverage was broadened.
"Q. I see. Now, did an actual new policy form go out to each one of those insured in replacement of the standard form policy? A. No.
"Q. It did not. How about endorsements going out on those standard *525 form automobile policies that were in existence to exclude other owned but not insured automobiles? A. Well, the ones that we were aware of with additional automobiles, they were excluded."
Another witness who testified on the point was L. W. Daniels on behalf of Allstate Insurance Company and who stated he had been in the insurance business about 20 years. In fact he had been with the Casualty and Surety Division of the Louisiana Insurance Rating Commission and was at the time he testified with the firm of Herrin, Collins and McKinnis who operated a general insurance business. He testified as follows:
"Q. Did your companies, your agencies, as of October one you considered every policy you had in effect which was eligible for family coverage to be a family policy? A. The rule stated that all outstanding policies would be interpreted to give the broader coverage.
"Q. And all companies agreed to that policy, agreed to interpret their policies in accordance withA. That was rules that were released by the Casualty and Surety Division.
"Q. Any policy you had in effect on October the first is adjusted the same as if it had been on one of the new forms? In other words, a person had the same protection. A. The rule works, if a coverage is broadened, then the companies interpret it to the broader coverage. In reverse, if the coverage was restricted, then you couldn't take it away from any outstanding contract.
"Q. But if a person, say, would have coverage under a family policy where he wouldn't have had coverage under the old standard form, and come October the first you give him the coverage under the new family policy? A. Yes, sir."
We also find additional testimony by Mr. Tyler whom it has previously been stated was an official with Allstate Insurance Co. with regard to the effect of the Standard Form Policy after October 1, 1956, as follows:
"Q. How about a policy that you wrote during the meantime, was it considered according to the terms and conditions of the policy as written (I'm talking about after October the first), or was it considered to afford the broader coverages of the family policy? A. Well, as instructed by the Louisiana Casualty and Surety Division, we were instructed to interpret the policy to afford the broader coverage.
"Q. Your company did write a letter to the insurance commission agreeing so to interpret? A. I believe they did.
"Mr. Organ: We stipulated to that, Mr. McKinnis."
As shown by the evidence some companies, immediately after October 1, 1956, started endorsing their policies to exclude owned but uninsured automobiles where they were aware that an insured owned more than one automobile. Allstate did not take any action although they knew that DiBenedetto had the 1954 Chevrolet and the 1947 Chevrolet, and that they had agreed specifically by letter to interpret Mr. DiBenedetto's policy as including the broader coverage under the new Family Policy.
They offer as a defense the lack of intent originally between the parties to the contract of insurance to include the 1947 Chevrolet automobile and cite many cases in the jurisprudence upholding such a contention. However, the cases are not apposite under the facts in this case, for Allstate as well as all insurance companies knew of the new Family Policy and that an exclusion provision would have to be issued as to any second uninsured *526 or specifically uninsured automobile owned by the insured. There is no question raised as to the legality of the directive issued by the Casualty and Surety Division of the Louisiana Insurance Rating Commission and, in fact, the evidence amply and by a preponderance thereof shows that not only Allstate but all insurance companies formally agreed by letter to construe all standard form policies in existence as of October 1, 1956, as extending the broader coverage of the family policy unless they issued an exclusion provision to the insured. If the Directive of the Casualty and Surety Division was legal, and it has never been questioned, then DiBenedetto was not a necessary party in order that a change might be effective in the terms of the Standard Form Policy that had been issued to him on April 17, 1956. After October 1, 1956, the original intent as to coverage or lack of coverage on the 1947 Chevrolet Automobile between Allstate and DiBenedetto could only have been maintained or preserved by an exclusion provision issued by Allstate to DiBenedetto. This they did not do and we therefore find no merit in the defense of lack of intent between the parties at the date of the issuance of the standard form policy to DiBenedetto. We therefore hold that the 1947 Chevrolet automobile involved in the collision whereby plaintiff was severely injured was covered under the standard form policy issued on April 17, 1956, by virtue and under authority of the Directive of the Casualty and Surety Division of the Louisiana Rating Commission issued on August 27, 1956, and effective October 1, 1956, and the formal acceptance of such directive by Allstate.
There remains the question of quantum. The policy issued by Allstate has a limitation of $10,000. This was the amount awarded by the lower court against State Farm Mutual Automobile Insurance Company as the insurer of Lobell, and was based upon a limitation in that policy of $10,000. Plaintiff's injuries are accurately and correctly summed up in plaintiff's brief, as follows:
"Plaintiff asks for damages in the amount of $60,000.00. This is not an exaggerated figure, but on the contrary, represents what we believe to be a moderate appraisal.
"In order to save time in the Court below, all parties agreed and stipulated that the hospital record containing some 79 pages would be admitted as evidence. This hospital report indicated the following diagnosis:
"1) Head injury with cerebral laceration and contusion.
"2) Contusions severebladder
"3) Contusionswith probable intracapsular rupture of right kidney
"4) Fractures of Rt. 11th and 12th Ribs.
"5) Fractures of Pelvic bones, involving public bones and right wing of sacrum." (Chart Service Record, Exhibit P-8.)
"The X-ray report (contained in P-8) makes the following report with respect to fractures:
"`The following fractures are demonstrated:
"`1. Fractures of posterior portions of the right 11th and 12th ribs near the upper pole of the right kidney, Fragments show mild displacement.
"`2. Vertical fractures through the right wing of the sacrum, with only slight displacement of the fragments.
"`3. Fracture of the body and of the superior ramus of the right public bones. Fragments show only slight displacement.
"`4. Fracture of superior ramus and probably and/inferior ramus of the left public bone, without displacement of the fragments.'
*527 "Upon arrival at the hospital, the attending physician called in two specialists to treat plaintiff, Dr. Joseph M. Edelman, a neuro-surgeon, and Dr. Matthew J. La-Nasa, a urologist.
"Dr. Edelman's diagnosis was stated as follows:
"`I found on examination of the patient that she was deeply comatose and would not respond even to the most painful sort of stimulation. She had a pupil which was dilated on the right side, and it was my feeling that she had had a severe brain injury, and that she possibly had, not only bruises and perhaps tearing of the brain with muscle hemorrhages in the brain, but possibly could have a blood clot which was causing pressure on the surface of the brain. It was for that reason that I recommended to Dr. Tanna that we do an operation that we call exploratory trephinations. What that means is that we make small openings on either side of the skull to be certain that the patient does not have a blood clot which is pressing on the brain.'
"The operation was performed with a special type of drill `that looks very much like an ordinary brace and bit'. Although no clot was found, Dr. Edelman made this statement about the condition of the brain:
"`Well, you can't tell very much, really, about the condition of the brain, because you only have an opening perhaps a half to five-eights of an inch in diameter, but the brain bulged through the openings in the skull, which indicated that the brain was under considerable pressure. Now this pressure was undoubtedly due to hemorrhages within the brain, possibly due to actual tearing or laceration of the brain. We can never be certain about that. From her clinical condition, I would certainly surmise that she at least had multiple hemorrhages in the substance of the brain to cause, first, her coma, and secondly, to cause this bulging of the brain through these small openings that we made. Now, her course in the hospital was rather a stormy one. She remained comatose until around November the ninth to tenth when she became more or less rational. Now, when she first came in I was very doubtful that she was going to survive the head injuries, she looked that bad. She also had other signs which we call signs of decerebrate rigidity. What that means and what we observed is certain reactions of the patient. For instance, if we cause pressure over a particular nerve here above the eye, what we call the superorbital nerve, that simply means the causing of painful stimulation to the patient. The patient would become rigid; she would stretch her arms and legs out and the arms would be turned inward and the legs, the feet, would be pointed down and turned inward. This is usually a sign of damage or injury to what we call the deeper structures of the brain, and that's why we call that condition the decerebrate condition. It's also seen in animals in which part of the brain has been removed. So, all of those signs indicated that she had a very severe brain injury. And the fact that she was unconscious from the period of October Twenty-sixth until around November ninth or tenth indicated that she had a severe injury. Now, she finally became rational around the tenth of November and she was discharged from the hospital on November eighteenth. She had certain other complicating things which I think can be covered better by other specialists who saw her at that time. I would prefer, if it's all right, not to go into those other complications now.'
"Plaintiff was treated for her kidney injury by Dr. LaNasa, who testified (Tr. 144-158) at length concerning his treatment. He described the fractures in the pelvic and sacral regions, and testified:
"`From the way these bones were broker up, she has ever ind  a (sic) a person would have chance of sustaining kidney or bladder injuries due to the location of all of these bones being right near this kidney and bladder, kidneys and bladder.'
*528 "Plaintiff had undergone a female operation performed by Dr. LaNasa about a month prior to the accident, and there can be little doubt that the serious injuries received in the accident aggravated any weakened condition which remained. Dr. LaNasa testified that plaintiff's urine had cleared up by February 28, 1957.
"Of course, the seriousness of plaintiff's injuries revolves around the permanent disability which she has sustained. Plaintiff, because of the injury to her brain, cannot keep a proper balance, and in this connection she cannot wear high heel shoes. This disability was described by Dr. Edelman:
"`Her lack of balance is actually the difficulty which I just described in her right leg. She does not control that leg as well as she did before the accident. She does not have normal control of the leg. She has this so called spasticity or stiffness, and I think that is the reason she has difficulty with her balance and in doing things with her lower extremities.'
"As a further result of her brain injury, plaintiff has double vision. Dr. Edelman attributes this double vision to the head injury and perhaps damage to the nerve controlling the muscles to the eyes.
"Plaintiff's mother testified at length regarding plaintiff's present disabilities. Dr. Edelman testified that in his opinion, plaintiff has suffered a permanent brain injury, and he estimated the percentage of disability as between ten and twenty per cent.
"Of course, we do not believe that it is necessary to delve at length into the seriousness of a permanent brain injury.
"Plaintiff is a divorced young lady with a dependent child. She testified that she had intended to go back to work as soon as she had recouperated from the female operation. She is now not in a position to do so. In all probability she will require some care and medical attention for the rest of her life. She was twenty years old when this litigation commenced, and her life expectancy was 42.20 years. She has only her father and mother to rely upon for the support of herself and her minor child.
"As a further indication of the extent of plaintiff's injuries, and the treatment which was required to the date of trial, medical bills were offered and proved in the amount of $2,257.85."
There is no question but that the $10,000 coverage afforded under the policy of Allstate Insurance Company is wholly inadequate in view of plaintiff's severe injuries and suffering as a result of the collision, and the award would be much more were there ample coverage. We will award the full amount of $10,000.
The Allstate Insurance Company's policy also carried medical benefits on any occupant of the car up to the extent of $2,000. Plaintiff is entitled to an award in this amount, also.
For the above and foregoing reasons it is ordered that the judgment of the lower court be annulled and set aside and that there now be judgment in favor of the plaintiff, Vera LeJeune, and against the Allstate Insurance Company in the full sum of $10,000 and the additional sum of $2,000 with legal interest from judicial demand until paid.
It is further ordered that there be judgment in favor of State Farm Mutual Automobile Ins. Company and the Parish of East Baton Rouge, and against the plaintiff, Vera LeJeune, dismissing plaintiff's suit as to both parties.
It is further ordered that the defendant, Allstate Insurance Company, pay all costs.
Judgment affirmed in part and reversed in part.